IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs November 12, 2008

**GERALD PENDLETON v. STATE OF TENNESSEE**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 02-00512     Carolyn Wade Blackett, Judge**

_____

**No. W2007-02273-CCA-R3-PC  - Filed December 12, 2008**

_____

The petitioner, Gerald Pendleton, was convicted of first degree felony murder, aggravated child abuse, aggravated child neglect, and perjury and sentenced to life imprisonment for the felony murder conviction and twenty years each for the aggravated child abuse and aggravated child neglect convictions, with all sentences to be served concurrently.  He was also sentenced to eleven months, twenty-nine days for the perjury conviction, to be served consecutively to the aggravated child neglect conviction.  He subsequently filed a petition for post-conviction relief, which the court denied.  On appeal, the petitioner contends he received ineffective assistance of counsel at trial. Following our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and D. KELLY THOMAS, JR., J., joined.

Patrick E. Stegall, Memphis, Tennessee, for the appellant, Gerald Pendleton.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; William L. Gibbons, District Attorney General; and Dennis Johnson, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The petitioner was indicted for first degree felony murder, aggravated child abuse, aggravated child neglect, and perjury, arising out of the death of his girlfriend's two-year-old son.  Our opinion on direct appeal provides a synopsis of the evidence presented at his trial:

Camilya Wright testified that she has two children, a son named J.W.,[1] and a daughter named K.W.,[2] who was also the Defendant's daughter. She testified that, on July 12, 2001, J.W. was two years old. She said that her relationship with the Defendant was "all right" until he lost his job and she told him, right after the 4th of July, that she was going to move back home to live with her mother. She testified that the Defendant said he was fine with that "but the expression on his face was like he was upset, angry." She said that, on July 12, 2001, she was working at Cingular Wireless Warehouse and she lived about forty to forty-five minutes from work. She testified that, on that morning, she left for work around 9:30 a.m. and when she left that morning, K.W. and the Defendant were still sleeping and J.W. was awake. She said that J.W. was "saying his A.B.C's," and she told him she was leaving and he should go back to sleep. Wright testified that the last time she saw J.W. before he died he looked normal and there were no bruises on him.

Wright testified that she came home right after work, on July 12, 2001, and she found the Defendant in the kitchen cleaning a pillow. The Defendant told her that "he had spanked [J.W.] for messing on the pillow." Wright testified that she had seen the Defendant spank J.W. before using his hand or a belt. She said that the Defendant then went outside to get a basket from her car, and she turned on the hallway light to "look in on [the children]." She testified that she and the Defendant went to bed around 11:30 p.m., and she said that she did not wake up during the night.

Wright testified that the Defendant woke her up at around 6:00 a.m. and he "told me there was something wrong with [J.W.]". She said that the Defendant was "holding him, shaking him, I guess trying to wake him up." She testified that the Defendant tried to revive J.W., and he told her to "go call 911," which she did. Wright testified that, during this time, the Defendant would not let her touch J.W., and the Defendant told her to get K.W. and go into the living room. She said that she then called her mother and "told her to come out there." Wright testified that a fire truck arrived and the emergency workers tried to give J.W. oxygen. An ambulance arrived a short time later. She said that the emergency workers took J.W. downstairs to the ambulance and then they told her "that he was already dead." Wright testified that, during this time, the Defendant was talking to the paramedics and the police officers that had arrived, but she did not hear these conversations.

Wright testified that she, the Defendant, and K.W. went to her mother's house. She said that the Defendant said that he had given J.W. "some Fletcher's Castoria because he . . . messed on the pillow." She testified that the Defendant said that he heard J.W. "squirming," and he went to see if he was doing alright. She said

[1] We will refer to the minor children by their initials.

[2] We will refer to the minor children by their initials.

that the Defendant told her that he put J.W. "on the toilet" because he "thought maybe [J.W.] had to go to the bathroom." Wright testified that they stayed at her mother's house until the detectives called and told them to come to the police station.

On cross-examination, Wright testified that, when she first met the Defendant, J.W. was approximately ten months old. She said that she lived with her mother, the Defendant, J.W., and K.W. at her mother's house for about four or five months. She testified that J.W. had had "bowel problems" since he was about one year old. She explained that this began when he changed from "infant milk to regular milk" because "[i]t would make [J.W.] constipated." Wright testified that, based on doctor's instructions, she and the Defendant gave J.W. Fletcher's Castoria sometimes. She said that when she and the Defendant moved to Millington, she would work and the Defendant would look after J.W. and K.W., and, if the Defendant was looking for a job, the Defendant's sister would watch the children.

Wright testified that, sometime before the 4th of July, the Defendant and J.W. told her that J.W. had slipped and fallen in the kitchen. She said that she would ask J.W. "if anyone hurt him" and "[J.W.] said he would tell [her] if anybody hurt him," but he never indicated that anyone had hurt him. Wright said that J.W. was with the Defendant for about eleven hours a day, five days a week. She said that, when the family moved to Millington, J.W. still had problems with "his bowel movements" but not as much because he was not drinking regular milk that often. She testified that, most often, the Defendant would feed J.W., and he was responsible for J.W.'s diet. She said that the Defendant was the primary care provider for about three months, and she felt comfortable about leaving him with the children.

Mike Johnson, an Emergency Medical Technician ("EMT") with the Millington Fire Department, testified that, on July 13, 2001, he responded to a call about a two-year old child, who he later determined was J.W., suffering from a "possible full arrest." He said that, when they arrived at the apartment, J.W. "was laying on the bed and he was not breathing. He was cool to the touch." He testified that he and another fireman began to perform CPR on J.W. until the ambulance arrived, and when the ambulance arrived, Johnson took J.W. to the ambulance. Johnson testified that the paramedic on the ambulance called a physician who told the paramedic "she could go ahead and stop CPR." He said that the police were called to the scene "[b]ecause of bruising . . . that was found on [J.W.] . . . [i]n the stomach area."

On cross-examination, Johnson testified that his station received the call because they were closest to the address, and it took about three minutes to arrive at the residence. He said that, when they first arrived, there was no "suspicion of any wrongdoing" and that they found J.W. on the bed. He testified that there was "some discolored stuff right there around [J.W.'s] mouth," which he guessed "was the castor oil." Johnson testified that he checked for a pulse, did not find one, but still thought

that CPR might help. Johnson testified that he noticed bruising in the abdomen area, and "there were several places [of bruising] that we noticed in this area."

On re-direct examination, Johnson testified that he and other emergency personnel "started getting suspicious" after they got J.W. into the ambulance. He explained that he was not suspicious when he received this call because such calls are "pretty common." On re-cross examination, Johnson testified that he did not notice any bruising on J.W.'s forehead, and it was the bruising in the abdomen region that caused his suspicion about "who did what." He conceded that he was not trained to determine whether bruising was caused internally or externally.

Reed Johnson, an officer with the Millington Police Department, testified that he was working on the morning of July 13, 2001, and he was called to the Defendant's residence. He said that, when he got there, he saw an ambulance and a fire truck, and other emergency personnel told him that there was a two-year-old male that the paramedics were no longer giving CPR. Officer Johnson testified that he met with the Defendant who told him that, at about 1:00 a.m., J.W. woke up and told the Defendant that he had a sore stomach. He said that the Defendant said that he gave J.W. some Fletcher's Castoria and put J.W. on the toilet, and J.W. and the Defendant went back to sleep at about 2:00 a.m. He testified that he was the first police officer on the scene and, after "assess[ing] the situation," he called the detectives. Officer Johnson testified that he did not go into the apartment at any time. He said that he saw the child in the ambulance, but he did not go into the ambulance and he did not "notice anything about the child[.]"

On cross-examination, Officer Johnson testified that it is normal standard operating procedure in Millington to call a detective when a two-year-old child had died. On re-direct examination, Officer Johnson testified that it was normal procedure for the police to respond to any death. He said that his suspicions may have been raised because the Defendant repeated his story three or four times, which seemed as though he was "mak[ing] sure it was right." On re-cross examination, Officer Johnson testified that the Defendant repeated the same story to him and the lieutenant with the fire department. He said that the Defendant was speaking with the fire lieutenant when he arrived so he did not know who initiated that conversation and, since he was the first officer on the scene, he wanted to know what had happened.

Chris Stokes, a detective with the Millington Police Department, testified that, on July 13, 2001, he was called to the scene to investigate J.W.'s death. He said that, when he arrived, the fire department, ambulance, and two patrol cars were present and there was a two-year-old child in the ambulance that "had been pronounced dead." Detective Stokes testified that he looked at the child and, at first, did not notice anything, especially since the ambulance was dark. He said that he took photographs and, after they were developed, he noticed "bruises on the chest and stomach, mainly the stomach." He testified that, when he was at the crime scene,

Ms. Wright, the child's mother, was present outside, and he went into the residence with the Defendant and Officer Reed Johnson. Detective Stokes testified that, inside the apartment, there were "blood stains or what appeared to be a brown stain on the bed where the child was on the pillow." He said that the Defendant said that he had given the child "some brown medicine . . . Fletcher's Castoria." Detective Stokes testified that a belt was found under the cushions of the couch at the Defendant's residence. He testified that the child was taken to the medical examiner's office, and he went back to the department to note what he had learned at the scene. He said that he spent about forty-five minutes at the scene.

Detective Stokes testified that, later that afternoon, he spoke with the medical examiner, after which, he spoke with Ms. Wright, the Defendant, and the Defendant's sister. He said that it is the Millington Police Department procedure to videotape statements, and there was a video camera in the room where the interviews are conducted. He testified that, when he talked with the Defendant, there were two other detectives present, Sergeant White and Sergeant Cross. Detective Stokes testified that, before interviewing the Defendant, he advised him of his rights, which was recorded on the video. He said that the interview lasted almost two hours, and the Defendant was not under arrest at that time. He testified that he and his "co-case" officer, Sergeant White, were in contact with the Attorney General's Office and informed the Office of what information they had obtained. He said that the Attorney General's Office told them to arrest the Defendant about an hour after the Defendant left the station.

On cross-examination, Detective Stokes testified that this was his first homicide investigation. He said that, when he got to the scene, he first spoke to Officer Reed Johnson to find out what had happened. He explained that Officer Johnson told him that the fire department responded to a 911 call, and the police responded at the fire department's request after the child was pronounced dead. Detective Stokes testified that he looked at the child, and did not notice bruising on the abdomen. He said that he did not speak with Ms. Wright because she was "distraught," but he did speak with the Defendant who told him that he tried to do CPR on J.W. He testified that the Defendant showed him where everyone in the residence sleeps. He said that he did not see K.W. on the scene, but she may have been with her mother in the vehicle. Detective Stokes testified that, on the interview videotape, the Defendant told him that K.W. was a "buck wild sleeper." He testified that J.W. and K.W. slept together, according to the Defendant and Ms. Wright, in a small children's bed. He said that when they interviewed Ms. Wright, she was given Miranda warnings because "she was also one of the care givers of the child" and "a suspect at this point." He explained that both the Defendant and Ms. Wright were viewed as suspects, the Defendant's sister was not a suspect.

Detective Stokes testified that he spoke with the medical examiner, Dr. Cindy Gardner, who told him that the cause of death might be trauma to the abdomen and the head. He said that Dr. Gardner told him that the abdomen was filled with soup

-5-

and macaroni and a two-year-old child has a small abdomen and it was "like a balloon bursting. . . ." He testified that he did not remember any other explanation "other than a hard trauma to that area." He said that he asked the medical examiner if a belt could have caused this injury and the examiner told him it could not be because it would "have to be some kind of force . . . some kind of weight." Detective Stokes testified that the TBI Lab analyzed the "brown stains" found on the pillow in J.W.'s room and, to his recollection, determined it to be blood. He said that, when he arrived at the scene, his first theory was that the child may have overdosed or ingested some poison because the fire department and medics on the scene "thought that the child had aspirated on the liquid during the night." He testified that, based on the medical examiner's conclusion, he thought there must have been a person that applied force to cause the ruptured abdomen, but he did not consider that person to be a child.

On re-direct examination, Detective Stokes testified that he first learned that the Defendant had spanked J.W. when he admitted to disciplining him on the videotape interview. He said that, based on what the Defendant told him, he had no reason to believe that the substance on the pillow was blood because it was the same color as the castor oil that the Defendant gave to J.W. He said that he asked the lab to test the pillow to see if castor oil was present and they said they could not. He testified that the bottle of castor oil that was in the house was still sealed. On re-cross examination, Detective Stokes testified that he did not ask the Defendant, Ms. Wright or the Defendant's sister to sign any documents waiving their rights, but "[i]t was all done on video."

William Graves, an officer with the Millington Police Department, testified that, on July 14, 2001, he arrested the Defendant and transported him to Millington Police Headquarters. He said that he and Lieutenant Estes read the Defendant his Miranda rights and had him sign a waiver form in his presence.

Dr. O'Brian Cleary ("O.C.") Smith, the head of the Forensic Pathology Division at the University of Tennessee and associate professor of pathology, testified, as an expert, that he is licensed to practice medicine in Tennessee and that one of his duties was to perform autopsies. He testified that he performed an autopsy on J.W. on July 13, 2001, and concluded that J.W. had died as a result of multiple injuries. He said that J.W.'s injuries consisted of head injuries and "predominately injuries to the abdominal area" including the rupture of the stomach. Dr. Smith testified that there was bruising on the "left brow of the head," as well as bruising around the left side of the chest and the right side of the abdomen. The doctor explained that there were three areas of bruising: the right side of the abdomen; below the rib cage; and "where the bottom of the rib cage meets the abdomen." He said that this bruising was "relatively recent" because there was a "recent hemorrhage" but no inflammation. He opined that the child did not live long enough for inflammation to occur. He testified that the "predominant injury" was a stomach rupture "in which compressive force had caused the stomach to burst releasing the

stomach contents within the abdomen as well as causing bleeding to accumulate within the abdomen."

Dr. Smith testified that the abdomen swelled from about three cups of "fluid which was fecal seep from the inflamed or the irritated abdominal wall" that was caused by the ruptured stomach. He said that there was also bleeding of the pancreas and bruising of the intestines, "especially the large intestine." He explained that "[s]ome . . . blunt force" contacted J.W.'s abdominal wall with enough force as to bruise his intestines. Dr. Smith testified that he did not believe the force of a belt could have caused the injuries because "in order to achieve the compression that is necessary to rupture the stomach, there has to be a lot of pressure put on the abdominal wall." He explained that this force was more likely the result of a heavy object, rather than a light one,[] like a belt. He said that, had a belt caused J.W.'s injuries, J.W. would have had a scrape on the skin surface, which was not present, therefore the doctor "reject[ed]" the notion that a belt was the instrument which caused J.W.'s injuries.

Dr. Smith testified that J.W.'s injuries would have to be caused by "severe force and sometimes even massive force in order to cause damage this deep inside the abdominal cavity. . . ." He said that the abdomen "has to be compressed deeply enough" to cause the stomach to rupture. He testified that he did not believe that a ten month to a one-year-old child could have "feasibl[y]" caused this injury unless there were "greater specifics as to how a child of that age could deliver a blow of that force." Dr. Smith testified that the injuries would be consistent with some force inflicted from an adult with "[a] hand, a fist, a knee, a foot, something like that could produce it." He said that the symptoms of this type of injury would include, initially "tak[ing] a person's wind" and causing pain because the nerve endings that line the abdominal cavity are sensitive to pain. He testified that, when the stomach ruptures, the contents will "spill out" and these contents will contain acid. He testified that a person may not want to be moved in order to avoid further irritation. Dr. Smith testified that a child may die within hours after receiving this type of injury, but it is difficult to state exactly how long it would take for death to occur. He said that he did not believe that this type of injury could come from CPR performed by trained professionals because the damage was too extensive, and "the compressions would be in entirely the wrong spot." Further, he testified that it appeared that the accumulation of fluid occurred before CPR had been applied. Dr. Smith testified that this rupture probably occurred within a short time after the child had a meal because a full stomach is "tense" making it "easier to rupture. . . ." He said that, because the abdominal skin is "elastic," it is possible to cause internal damage to the organs without leaving a surface mark.

On cross-examination, Dr. Smith testified that he could not state with certainty what time J.W. was struck, exactly what struck J.W., who struck him, or why he was struck. He testified that he could not say whether a fist or a foot caused the injury because he did not know. He said that, in order to produce damage, the

-7-

object has to have weight and must be moving. He testified that he did not believe the injuries were caused by "lying on the child" because that would also result in further restrictions on the child's chest and his ability to breathe. Dr. Smith explained that this would lead to a condition known as "traumatic asphyxia" where there is bleeding in the whites of the eyes because of rupture of the blood vessels. He said that this condition causes a person to die because of failure to breathe. He testified that, based on the traumatic asphyxia cases he had seen, gastric rupture was not a component. He said that, since the instrumentality was not know[n], it was difficult to estimate whether the injuries occurred as a result of "one blow or several blows." He testified that it was possible for someone not trained in CPR to cause the bruising around the abdomen.

On re-direct examination, Dr. Smith testified that CPR applied at or near the time of death "would not show the degree of bleeding in the child's tissues. And it would not show the degree of inflammation which is the reaction of living tissue to an insult of some sort." He said that, based on the tissue examined, the injury had to occur "some hours" before CPR was applied. He testified that, based on his observations, J.W.'s injuries were consistent with an injury that occurred before 7:00 or 8:00 p.m. and before the child was found at 6:00 a.m. the next morning. He said that other variables to consider were that, at some point, the child goes into shock based on the lost fluid and this slows down the inflammatory process.

State v. Gerald Pendleton, No. W2003-03043-CCA-R3-CD, 2004 WL 2941153, at *1-7 (Tenn. Crim. App. Dec. 20, 2004), perm. to appeal denied (Tenn. May 9, 2005). At the conclusion of the trial, the jury convicted the petitioner as charged, and he was sentenced to life imprisonment for the felony murder conviction and twenty years each for the aggravated child abuse and aggravated child neglect convictions, with all sentences to be served concurrently. He was also sentenced to eleven months, twenty-nine days for the perjury conviction, to be served consecutively to the aggravated child neglect conviction.

Following an unsuccessful direct appeal and application for permission to appeal to the Tennessee Supreme Court, the petitioner sought post-conviction relief, contending he received the ineffective assistance of trial and appellate counsel, his conviction was based on use of a coerced confession, and his confession was "based on use of illegal search and seizure." The post-conviction court dismissed all of the petitioner's allegations[3] except his claim of ineffective assistance of trial counsel, for which it conducted an evidentiary hearing on August 9, 2007.

At the hearing, trial counsel testified that he was hired to represent the petitioner at trial and on appeal. Counsel said that the petitioner gave an unfavorable videotaped statement to police that was preceded by a written waiver of rights. However, the petitioner claimed it was not his signature on the waiver of rights form, so the case was delayed to determine whether the signature was the petitioner's. Counsel recalled that handwriting experts for both the State and defense determined

---

[3]The petitioner does not dispute the dismissal of these issues.

that the signature on the waiver was the petitioner's, which ultimately led to the petitioner's perjury conviction and the strategic decision that the petitioner not testify at trial.

Counsel testified that two coroners, Dr. O.C. Smith and Dr. Cynthia Gardner, performed the autopsy of the victim. Counsel explained that one defense strategy was that the victim's death was an accident, but the coroners ruled that his death was not an accident. Counsel recalled that "the best that [he] could get" was Dr. Smith saying he did not know exactly when the victim sustained the injury to his stomach. Counsel recalled that Dr. Smith testified that it would have taken the force of a "full blown kick" to cause the victim's stomach to rupture, which was also what Dr. Gardner told counsel early in the investigation.

Counsel testified that he decided not to call Dr. Gardner to testify at trial because Dr. Smith was going to testify as a witness for the State and "if we have two doctors who are saying the same thing it is going to reinforce the [S]tate's argument and it's not going to help us." Counsel explained that the coroners did a preliminary report and then a final full report for use in court and said he thought that was what caused confusion with the petitioner. Counsel said that Dr. Gardner's initial report implied there was a possibility the victim's death was an accident and that was why he noted the word "accident" in his notes. Counsel stated, however, that Dr. Gardner never said it was an accident, but "it was perhaps more me than her saying that it was an accident." Both doctors told counsel that more force "than simply dropping the child" was needed to rupture the stomach, "literally, a kick, or a punch, or something of that nature." Counsel testified that the timing of the injury was a big issue because that could have included or excluded the petitioner as the one responsible, but he was not able to get that information from either doctor.

Counsel testified that he talked to the victim's mother and the petitioner's sister and mother, and all agreed that "stomp[ing] on a child" was out of character for the petitioner. Counsel stated that another defense strategy was that someone else, such as the victim's mother, administered the "blow" to the victim's stomach. Counsel said that he spoke with the victim's mother and did not get the impression that she had a violent nature. However, he "didn't see any reason why she couldn't have snapped any more than [the petitioner] could have snapped." Counsel said he discussed this theory with the petitioner but did not remember whether the petitioner gave him the names of any witnesses who could have supported the theory that the victim's mother "was a violent, unstable person." Counsel did not conduct a criminal background check on the victim's mother because "she held a pretty good job where [he did not] believe that she would have been employed by that particular company . . . if she had a record." Counsel said he was able to present through the testimony of the victim's mother that she was alone with the victim during the time frame in which the victim's injury may have occurred.

Counsel testified that he discussed the victim's history of peritonitis with Dr. Gardner and the doctor was clear that the victim's injuries were not related to any stomach or bowel problem. Counsel recalled that the petitioner attempted to administer CPR to save the victim but was unsuccessful. Counsel said he did not obtain an expert to testify concerning injuries arising out of improper CPR administration because that was inconsistent with the victim's cause of death of "blunt trauma to the stomach."

The petitioner testified that his family obtained his case file from counsel in preparation for the post-conviction proceeding and that the file contained an autopsy report with the word "accident" on it. He stated that he wanted Dr. Gardner to testify because she could explain why "accident" was written on the autopsy report. The petitioner could not recall whether counsel ever told him that he wrote "accident" on the report. The petitioner asked counsel to have Dr. Gardner explain why "accidental death" and "peritonitis" were written on the autopsy report, and counsel told him that Dr. Gardner and Dr. Smith were saying the same thing so there was "no sense in getting her down here." The petitioner admitted that the autopsy report he received before trial had "peritonitis" on it, but did not have "accident" written on it. The petitioner acknowledged that counsel presented defenses on his behalf, including that the death was an accident or that the victim's mother was at fault.

The State recalled counsel, and counsel testified that it was he who had handwritten the word "accident" on a copy of the medical examiner's report.

After the evidentiary hearing, the post-conviction court entered an order denying the petition. The court found that the petitioner failed to prove counsel's conduct fell below the objective standard of reasonableness or that the outcome of his trial would have been different but for the alleged deficiencies in counsel's performance.

## ANALYSIS

### Standard of Review

Post-conviction relief "shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f) (2006). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006). When reviewing factual issues, the appellate court will not reweigh the evidence and will instead defer to the trial court's findings as to the credibility of witnesses or the weight of their testimony. Id. However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issues of deficient performance of counsel and possible prejudice to the defense are mixed questions of law and fact and, thus, subject to *de novo* review by the appellate court. See Wiley, 183 S.W.3d at 325; State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

### Ineffective Assistance of Counsel

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. See U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to determine the competence of counsel, Tennessee courts have applied standards developed

in federal case law.  See State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee).  The United States Supreme Court articulated the standard in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984), which is widely accepted as the appropriate standard for all claims of a convicted petitioner that counsel's assistance was defective.  The standard is firmly grounded in the belief that counsel plays a role that is "critical to the ability of the adversarial system to produce just results."  Id. at 685, 104 S. Ct. at 2063.  The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. at 687, 104 S. Ct. at 2064.  The Strickland Court further explained the meaning of "deficient performance" in the first prong of the test in the following way:

> In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. . . . No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.

Id. at 688-89, 104 S. Ct. at 2065.  The petitioner must establish "that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms."  House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (citing Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996)).

As for the prejudice prong of the test, the Strickland Court stated:  "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  466 U.S. at 694, 104 S. Ct. at 2068; see also Overton v. State, 874 S.W.2d 6, 11 (Tenn. 1994) (concluding that petitioner failed to establish that "there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different").  To satisfy the prejudice requirement of Strickland when alleging that counsel was ineffective for failing to offer testimony from a favorable witness, the post-conviction petitioner must "(1) produce the witness at his post-conviction hearing; (2) show that through reasonable investigation, trial counsel could have located the witness; and (3) elicit both favorable and material testimony from the witness."  Denton v. State, 945 S.W.2d 793, 802-03 (Tenn. Crim. App. 1996) (citing Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990)).

The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, 104 S. Ct. at 2066, and may not second-guess the tactical and strategic choices made by trial counsel unless

-11-

those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The fact that a strategy or tactic failed or hurt the defense does not alone support the claim of ineffective assistance of counsel. See Thompson v. State, 958 S.W.2d 156, 165 (Tenn. Crim. App. 1997). Finally, a person charged with a criminal offense is not entitled to perfect representation. See Denton, 945 S.W.2d at 796. As explained in Burns, 6 S.W.3d at 462, "[c]onduct that is unreasonable under the facts of one case may be perfectly reasonable under the facts of another."

On appeal, the petitioner argues that counsel was ineffective in his investigation of the victim's cause of death. He specifically asserts that counsel failed to investigate who had written the word "accident" on the autopsy report and failed to call Dr. Gardner, who "would have been better suited than Dr. Smith to testify about the autopsy and the likelihood of accidental death," as a witness. The petitioner also asserts that counsel was ineffective for failing to call an expert from outside the medical examiner's office to testify about how the victim's death could have been accidental.

First, with regard to counsel's failure to investigate who wrote the word "accident" on the autopsy report, we discern no deficiency in counsel's performance. Counsel testified at the evidentiary hearing that it was he who wrote the word "accident" on a copy of the autopsy report as part of his "own thought process." Therefore, there was no reason for counsel to investigate who had written it or why.

Second, we discern no deficiency in counsel's performance with regard to counsel's failure to call Dr. Gardner as a witness. Counsel testified that he made the strategic decision not to call Dr. Gardner because her testimony would have been redundant of Dr. Smith's and would have only served to reinforce the State's case against the petitioner. The post-conviction court found that the "[p]etitioner made no showing that defense counsel's decision not to introduce Dr. Gardner as an expert witness fell below the objective standard of reasonableness." This decision was an informed tactical and strategic choice made by counsel, which this court will not second-guess. See Hellard, 629 S.W.2d at 9.

Moreover, the petitioner failed to call Dr. Gardner as a witness at the post-conviction hearing to show what her testimony would have been had she testified at trial. "When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing" in order to establish prejudice. Black, 794 S.W.2d at 757-58.

Third, with regard to counsel's failure to secure an independent expert to testify that the victim's death could have been accidental, the petitioner has failed to establish prejudice. As found by the post-conviction court, the petitioner did not present this hypothetical witness at the evidentiary hearing, and this court may not guess what this hypothetical witness's testimony would have been. Id. at 757.

**CONCLUSION**

Based on the foregoing reasoning and authorities, we affirm the post-conviction court's denial of post-conviction relief.

_____

ALAN E. GLENN, JUDGE